ORIGINAL

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>JASON NEWLING | DOCKET NO. |
| | MAGISTRATE'S CASE NO.  17MJ01897 |

Complaint for violation of Title 18, United States Code, Section 1343: Wire Fraud

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALEXANDER F. MACKINNON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>June 2015 to present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT

JUL 3 1 2017

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1343]

Beginning at least in or about June 2015 and continuing to the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant JASON NEWLING knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud clients of a payroll processing company that he operated under various names (the "clients") as to material matters and to obtain money and property from the clients by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the above-described scheme to defraud, on or about February 3, 2016, caused the transmission of the following item by means of wire and radio communication in interstate and foreign commerce: a wire transfer in the approximate amount of $127,785 from an account at Bank of America, N.A. to an account at JPMorgan Chase Bank, N.A. through the interstate Fedwire system.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>DANIEL LATHAM     *Daniel Latham* |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>*[signature]* | DATE<br>July 31, 2017 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Kerry L. Quinn x5423

## AFFIDAVIT

I, Daniel R. Latham, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2016. I am currently assigned to the Los Angeles Field Office where I work on a Cyber squad, but initially was assigned to a White Collar Criminal Squad that specializes in investigating complex financial crimes.  I received approximately twenty one weeks of formal training in investigative techniques, including white collar matters at the FBI Academy located in Quantico, Virginia.  Since joining the FBI, I have participated in numerous investigations of white collar crime, including corporate fraud, advanced-fee schemes and securities fraud.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a request for the issuance of an arrest warrant and a complaint charging JASON NEWLING ("NEWLING") with wire fraud, in violation of Title 18, United States Code, Section 1343.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents obtained from various sources including financial institutions, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is probable cause to support the requested arrest warrant and federal criminal complaint.  It does not purport to set forth all of my knowledge

1

of or investigation into this matter, nor is it intended to provide all of the information obtained in connection with the relevant investigation.  Also, unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and are not *verbatim.*

### III.  STATEMENT OF PROBABLE CAUSE

**A.    Summary of Fraudulent Scheme**

4.    As set forth in more detail below, an FBI investigation has revealed that NEWLING, working through a payroll processing company that he operated under various names such as Ohana Holdings, LLC, Tides Staffing, LLC, Aloha HR, LLC, Aloha HR Trust, and Ohana HR Trust (collectively "ALOHA"), carried out a scheme to defraud ALOHA's clients, by falsely representing to clients that ALOHA would pay clients' taxes, when instead, NEWLING stole client money for his own personal use, including for school tuition for his children, automobile upgrades for his vintage vehicle, money paid to a specialty AR-15 rifle manufacturer and other gun stores, luxury vacation expenses, a custom pet crate for his cats, a high-end pet hotel for his dogs, dental bills, and other personal expenses.  In order to continue the scheme, NEWLING falsely told clients that their taxes had been paid when they had not, and when clients demanded their money back, NEWLING stopped returning phone calls, and directed others at ALOHA to do the same.

B.   **False Representations to Clients**

Company 1

5.   On February 17, 2017, I interviewed T.M., who told me the following:

a.   T.M. was the owner of Company 1, which was a project management company based in Las Vegas.

b.   T.M. had known NEWLING for fifteen years, and knew through their personal friendship that NEWLING ran a payroll processing company.

c.   When T.M. was expanding his business and taking on additional employees, he asked NEWLING if NEWLING's company could handle Company 1's payroll.

d.   T.M. went to NEWLING because he did not want to have any withholding problems.

e.   After Company 1 had signed up to use ALOHA's payroll services, Company 1 began receiving notices from taxing authorities in Nevada (one of the states where Company 1 conducted business) that its taxes had not been paid.

f.   T.M. called NEWLING regarding the delinquency notices, and NEWLING told T.M. that the notices were "ridiculous," that "there must be a mistake," and that he would get the issue cleared up.

g.   Soon after, Company 1 began receiving delinquency notices from other taxing authorities, including the IRS, the State of Tennessee, and the State of Maryland.

h.   Individuals from Company 1's accounting department began calling ALOHA representative P.V. to demand

proof that taxes had been paid, and P.V. stated that everything was fine and that the IRS had made a mistake. Company 1's representatives demanded proof of payment, but they never received anything.

        i.   Company 1 went out of business because of the fraud that NEWLING committed. T.M. had to take out a loan against his house to pay taxing authorities, and had to shut down Company 1 and lay off seventeen employees because of the unanticipated tax bills.

        j.   T.M. brought a civil action against NEWLING and NEWLING's companies and obtained a default judgment in that action. As of the date of the interview, he was still trying to collect on that judgment.

        k.   Some of the dates that T.M. provided during his interview are different from dates set forth in a civil complaint that Company 1 filed against NEWLING and NEWLING's companies in Nevada state court, and from dates provided by attorneys representing Company 1 in that lawsuit. T.M. told me that taxing authorities began to contact Company 1 in January 2016 regarding delinquent taxes, but as detailed below, the civil complaint alleges that taxing authorities began contacting Company 1 in May of 2016, and Company 1's attorney estimated that taxing authorities began contacting Company 1 in March, April, or May of 2016.

      6.   I have reviewed the complaint that Company 1 filed against NEWLING and NEWLING's companies in Nevada state court on May 31, 2016, Case Number A-16-737579-C (District Court of

Nevada, Clark County), and a declaration that T.M. submitted in that action in connection with a request for a pre-judgment writ of attachment.  The complaint and T.M. declaration generally allege the following:

      a.  Company 1 entered into an agreement with ALOHA for ALOHA to handle Company 1's payroll.

      b.  NEWLING repeatedly represented to T.M. that ALOHA would hold money that Company 1 gave to ALOHA for payroll and taxes in a trust account and that ALOHA would pay money due to taxing authorities in a timely manner.

      c.  Based on these representations, Company 1 gave money to ALOHA to hold in trust for those purposes.  On or about December 31, 2015, Company 1 deposited with ALOHA the sum of $169,250.37 in trust via Cashier's Check to pay its 2015 fourth quarter tax obligations, which were due on or before January 31, 2016.

      d.  In total, between December 2015 and March 2016, Company 1 entrusted ALOHA with sums in excess of $680,000.

      e.  NEWLING represented that all of the money that Company 1 had given ALOHA for tax purposes had been placed in trust and that ALOHA had paid Company 1's taxes to taxing authorities, including but not limited to the IRS, the State of Nevada, the State of Texas, the State of Tennessee, the State of Maryland, the State of California, and the State of Missouri.

      f.  In May 2016, taxing authorities began contacting Company 1 indicating that Company 1's fourth quarter taxes had not been paid.

g.   On May 24, 2016, Company 1's Vice President of Finance & Reporting (the "VP") contacted NEWLING regarding the unpaid obligations, providing an accounting of missing tax payments of over $106,000, and demanding that a cashier's check be paid to Company 1 out of the trust account that Company 1 believed ALOHA was maintaining.

h.   NEWLING assured the VP that the taxing authorities were incorrect and that the taxes had been timely paid.

i.   NEWLING represented to the VP that ALOHA could not refund Company 1's money because "checks have already been cut and sent. As they clear the bank I will send you copies of the cancelled checks." NEWLING also represented that he would contact the taxing agencies the next day and provide an accounting of where the tax payments were.

j.   After that, ALOHA stopped responding to Company 1's attempts to inquire about the missing money. ALOHA never paid the tax delinquencies that had accrued on Company 1's behalf, nor did it refund Company 1's money.

k.   As a result of the unexpected tax liabilities that ALOHA caused, Company 1 was forced to go out of business in 2016.

7.   On July 28, 2017, I spoke by phone with Jay Shafer, an attorney representing Company 1 in the civil litigation. Also present for the call were Assistant United States Attorney ("AUSA") Kerry Quinn and Chris Reade from Shafer's office. Shafer stated the following:

a.   On behalf of Company 1, they have obtained a default judgment against NEWLING and NEWLING's companies, but they have had trouble collecting on that judgment.

b.   They obtained a prejudgment writ of attachment in September 2016 to seize fund in ALOHA's Chase bank account, and although they were able to seize some money, NEWLING thereafter transferred his banking to Wells Fargo, and kept moving money to avoid paying the judgment.

Company 2

8.   On January 9, 2017, I interviewed R.S., who told me the following:

a.   R.S. owns and operates Company 2, a retail store in Los Angeles County specializing in e-cigarette accessories, atomizers, and vape juices.

b.   J.W., who worked with NEWLING and was a friend of R.S.'s at the time, introduced R.S. to NEWLING.  J.W. told R.S. that ALOHA could reduce Company 2's payroll expenses.  J.W. also represented that ALOHA would have better customer service and would be more accessible than other payroll companies because ALOHA was a local company.

c.   J.W. introduced R.S. to NEWLING, and NEWLING also pitched R.S. on ALOHA's business.  R.S. described NEWLING as someone who liked to party, and saw him spending large amounts of money at an adult entertainment club.  NEWLING also told R.S. that he could reduce Company 2's payroll expenses.

d.   Around June 2015, Company 2 entered into an agreement with ALOHA for ALOHA to provide payroll and human

7

resources services for Company 2, and Company 2 began sending checks to ALOHA for payroll and taxes.

e.   At the beginning of 2016, the California state taxing authority, the Employment Development Department ("EDD"), began contacting Company 2 indicating that Company 2's taxes had not been paid.

f.   R.S. gave the notices to J.W. to clear them up with NEWLING and S.H. (whom R.S. later described as NEWLING's "right hand man," characterizing NEWLING as more of a "socialite").

g.   S.H. told R.S. that he did not know why the taxes had not been paid.

h.   According to the EDD notices, Company 2's taxes had not been paid since the second quarter of 2015, when ALOHA took over Company 2's payroll.

i.   R.S. estimated that, as of January 2017, Company 2 owed the IRS $8,000 and the EDD $23,000.

j.   R.S. confronted S.H. about the unpaid tax liability, and S.H. blamed P.V., stating that she was the ALOHA employee responsible for paying clients' taxes.

k.   As of January 2017, ALOHA had not paid Company 2's delinquent taxes nor had it refunded Company 2's money.

Company 3

9.   On January 10, 2017, I interviewed H.N. and B.E.  They told me the following:

a.   H.N. is the owner of Company 3, a retailer in Los Angeles County that provides automotive, residential,

commercial, and marine computerized window tinting as well as other automotive accessories.

b.   B.E. is H.N.'s mother, and she helps H.N. manage some of the back office aspects of the business.

c.   H.N. heard about ALOHA through NEWLING, who was a regular customer at Company 3.  NEWLING told H.N. that ALOHA could save Company 3 money on its payroll services.  At the time, Company 3 was using Automatic Data Processing ("ADP") as its payroll company.

d.   J.W. visited Company 3 to pitch ALOHA's services. H.N. believed NEWLING had sent J.W. to Company 3 for this purpose.  Shortly after, on September 4, 2015, H.N. signed a contract with ALOHA for ALOHA to provide payroll services to Company 3.

e.   In or around April 2016, H.N. received a letter from the EDD explaining that forms submitted for Company 3 from January 2016 were incorrect because of non-payment of payroll taxes.  According to the letter, Company 3 had also failed to file a quarterly report for the first quarter of 2016.

f.   Following receipt of this notice, B.E. called P.V., whom B.E. understood to be ALOHA's Las Vegas office manager, to find out why ALOHA had failed to file taxes and failed to file the quarterly report for the first quarter of 2016.  In that call, P.V. reassured B.E. that everything was fine, telling B.E. that taxes had been paid and forms filed. (B.E. was not asked, and she did not explain how she was introduced to P.V.)

g.   B.E. called the EDD and was told that ALOHA may have processed Company 3's tax payments, but the EDD had not yet received those payments.

h.   After speaking with P.V., and feeling like she did not get answers to her questions, B.E. spoke with S.H.  S.H. came to Company 3 and brought paperwork for B.E. and H.N. to sign, and said that NEWLING told him that checks had cleared the EDD.  (B.E. was not asked, and she did not explain how she was introduced to S.H.)

i.   As of the date of the interview, Company 3's taxes were still delinquent.  ALOHA had paid only a small portion of taxes that Company 3 owed to taxing authorities for the time period when ALOHA was processing Company 3's payroll.

Company 4

10.   On February 3, 2017, I interviewed M.D.B., who told me the following:

a.   M.D.B. was a manager and co-owner of Company 4, a welding supply retailer in Los Angeles County.

b.   M.D.B.'s nephew, D.S.R., worked at ALOHA as a sales representative.  D.S.R. convinced M.D.B. to use ALOHA's services.

c.   On March 1, 2016, M.D.B. signed a one-year contract with ALOHA.

d.   In or around January 2017, M.D.B. received a notice from the EDD that Company 4 had not filed its Quarterly Contribution of Wages (DE-9) for the second quarter of 2016.

e.   On or about January 6, 2017, following receipt of this notice, M.D.B. emailed P.V., S.H., and another one of ALOHA's employees, asking why ALOHA had not filed Company 4's DE-9 form for the relevant quarter.  When her email went unanswered, M.D.B. sent several follow up emails.  She did not receive a response until January 19, 2017, at which point one of NEWLING's co-conspirators ("CC-1") emailed her saying that CC-1 would work on the filings.  (NEWLING and CC-1 lived together during the relevant time period, and are believed to be in a romantic relationship according to witness statements.  Further, as detailed below, I have traced large payments of client money from ALOHA bank accounts to both NEWLING and CC-1.)

f.   In or around February 2017, M.D.B. received another notice from the EDD indicating that Company 4 was delinquent in paying approximately $8,585.22 in taxes for the second quarter of 2016, which had resulted in a $9,807.14 tax bill including penalties and interest.

g.   At that point, M.D.B. hired G.D. to audit Company 4's finances related to tax returns that ALOHA had failed to file.  G.D. was a Certified Public Accountant ("CPA").

h.   M.D.B. calculated that Company 4's wages for the second quarter of 2016 were approximately $70,402.36.  ALOHA reported wages of approximately $155,301.92 for Company 4 in this same period.  (I know from my training and experience and discussions with other federal agents that overstatement of a company's payroll expenses to taxing authorities would increase the company's tax liability and would increase the amount of

money that a payroll processing company such as ALOHA would require the company to transfer to the payroll processing company for payment of that liability.)

      i.    As of the date of the interview, ALOHA had not paid Company 4's delinquent tax bill or refunded the money Company 4 had given to ALOHA for this purpose.

Other Interviews of ALOHA Clients

    11.  I have interviewed of representatives of three other clients that hired ALOHA to provide payroll services.  The other client representatives reported information similar to that reported in witness statements above, namely: (a) they hired ALOHA to provide payroll services, including payment of taxes, and deposited money into what they believed was a client trust account for this purpose; (b) a few months after they hired ALOHA, they started receiving notices from taxing authorities that their taxes had not been paid; (c) they contacted ALOHA representatives, including NEWLING, about the delinquency notices, trying to find out what had happened; (d) they received emails or other communications from ALOHA representatives indicating that taxes had been paid and that the notices were a mistake; (e) after continuing to receive tax delinquency notices, they demanded ALOHA return their money and pay delinquent taxes; and (f) ALOHA stopped returning phone calls after the clients made these demands.[1]

---

    [1] This investigation was initiated following a complaint to the FBI by one of the owners of an ALOHA client, whose business services were being used by an FBI supervisor, and who brought
*(footnote cont'd on next page)*

Emails & Other Client Communications

12.   I have reviewed emails and text messages that ALOHA's clients provided to the government, reflecting communications that NEWLING and CC-1 had with clients, through a phone number and email accounts that are linked to NEWLING and CC-1 through witness statements and other information obtained in the course of the investigation.   In summary, these texts and emails generally confirm statements given by ALOHA client representatives, including statements about NEWLING sending numerous emails throughout 2016 and 2017, repeatedly reassuring clients that taxes had been paid (when they had not) and apologizing for "misplacing" client money.

**C.   Bank Records**

13.   I have reviewed records obtained from JPMorgan Chase Bank for account number X9055 ("Account 1"), and spoken to FBI SA Heather Stachnik about these records.   SA Stachnik is another FBI white collar agent working on this investigation, and she has extensive experience in white collar investigations and in the analysis of bank records.   She is also a CPA.   The bank records show the following:

a.   Account 1 was held in the name of Tides Staffing, LLC DBA Aloha HR.

b.   NEWLING was the only signatory on Account 1.

---

the complaint to that supervisor.   This individual is one of the individuals whose statements to the law enforcement are summarized in the paragraph summarizing client statements.

c.    Between August 27, 2014, and November 27, 2016, over $8.7-million was deposited into Account 1.  Of that amount, approximately $8.4-million of deposits appear to be money that ALOHA received from clients.

d.    Nearly $1 million from Account 1 was transferred to other accounts.  Approximately $600,000 of that amount was transferred to another bank account at JPMorgan Chase that NEWLING maintained in the name of Tides Staffing LLC DBA Aloha HR ("Account 2").  Information related to Account 2 is detailed in the next paragraph.

e.    Three wire transfers, totaling $35,000, were wired from Account 1 to an account in CC-1's name.

f.    Over $300,000 was spent from Account 1 on expenses that do not appear to have any business purpose, including the following expenditures (approximate amounts): $14,500 to Wanlass Dental (a Las Vegas dentist); $2,800 to Waterman's (a Hermosa Beach restaurant); $2,400 to Luv Surf Vacation Homes (a vacation rental agency); $2,000 to Nordstrom (a clothing retailer); $2,000 to Custom Cages (a custom pet cage manufacturer); $1,900 to Camp Run-A-Mutt (a high-end pet hotel, day care center, and grooming salon); $1,800 to Guitar Center (a music instrument retailer); $1,700 to Quality Shoe Repair (a shoe repair retailer); $1,000 to Jack's Surfboards (a surfboard retailer); $800 to Dive n' Surf (an outdoor apparel retailer); $500 to Stratosphere Sky Jump (a Las Vegas thrill ride).

i.    I have spoken with representatives of several of these vendors and obtained records from these and

others, including Wanlass Dental, Nordstrom, Custom Cages, and Camp Run-A-Mutt. According to the vendor representatives with whom I have spoken and records obtained from the vendors, NEWLING was the person who made the relevant purchases. The information that I obtained from Custom Cages showed that NEWLING ordered a custom pet crate for his cats, which was sent to an address that I have traced to NEWLING's ex-wife.

g. Approximately $50,000 in ATM cash withdrawals were made from Account 1. Nearly all of the ATM withdrawals were made in California, and the majority were made in Hermosa Beach, where NEWLING and CC-1 lived at the time, according to surveillance that I conducted at their residence and other information obtained in the course of the investigation. The other ATM withdrawals were in other locations in southern California (such as Disneyland), a few locations in Nevada, and one in Hawaii.

h. Only a few payments were made from Account 1 to taxing authorities, even though this appears to be the only account that ALOHA used for this purpose, and ALOHA had numerous clients whose taxes were supposed to be paid. Payments made from Account 1 to taxing authorities included only three checks to the IRS (all of which had the same client name in the memo line), two checks to the EDD (for the same captioned client as the client for which IRS checks were issued), one check to the Nevada state taxing authorities, and a few other checks to different state taxing authorities. These are the only payments of which I am aware that ALOHA paid to taxing authorities for

any of its clients – whether from this account or other accounts identified to date.

14.   I have reviewed records received from JPMorgan Chase Bank for account number ending in X1610 ("Account 2"), and I have spoken to SA Stachnik about this account.  These records show the following:

a.   Account 2 was held in the name Tides Staffing LLC DBA Aloha HR.

b.   NEWLING was the only signatory on Account 2.

c.   Between May 29, 2015, and December 30, 2016, over $692,000 was deposited into Account 2; approximately $600,000 of this amount came from Account 1.

d.   Large expenditures were made from Account 2 on goods and services that do not appear to have a business purpose, such as $10,897 to the University of Utah as a tuition payment (where social media posts indicate that one of NEWLING's children was attending the University of Utah at the time), more than $17,000 in separate payments to the University of Utah, $4,000 to a furniture store in Redondo Beach, $4,700 to a specialty bike store in Las Vegas, approximately $2,000 to Desert Oasis High School (the high school that NEWLING's children attended, according to social media posts), and additional amounts for airline tickets, car washes, and restaurant bills.

15.   I have reviewed records received from Wells Fargo Bank for account number ending in X9293 ("Account 3"), and spoken to

SA Stachnik about these records.  These records show the following:

        a.    Account 3 was held in the name of Aloha HR Trust.

        b.    The signors on Account 3 are J.F. and S.H.

        c.    The account was opened on September 15, 2016.

        d.    Between September 15, 2016, and November 30, 2016, five wire transfers, totaling $75,000, went from Account 3 to CC-1's account at JPMorgan Chase Bank ("Account 4"), which is discussed in the next paragraph.

        e.    In the same time period, more than $40,000 was withdrawn from Account 3 at branch locations or in a store, and approximately $20,000 was paid to Cars Muffler & Automotive (an auto parts retailer and vehicle servicer in Redondo Beach), more than $12,000 to various airlines and hotels.com, and $3,641 to Moana Surfrider (a luxury Westin resort in Honolulu).

        i.    I obtained records from Cars Muffler & Automotive, and those records show that some of the relevant purchases were for upgrades and repairs to NEWLING's vintage 1969 Dodge Van (which was subsequently transferred to CC-1's name, according to public records), and some of the relevant purchases were for repairs for NEWLING's Volkswagen Passat, which I have observed in NEWLING's driveway with ALOHA advertising on it.

        f.    Approximately $800 in cash was withdrawn at ATM machines in Redondo Beach, Hermosa Beach, and Torrance.

        i.    I obtained ATM photos of these withdrawals, and they show that NEWLING was the one making the withdrawals.

I made this determination by comparing the individual pictured
in the ATM photos with the individual I know to be NEWLING from
previous interactions that I have had with him and photographs
that I have seen of him.  My familiarity with NEWLING's
appearance comes from an interview that I did with him on July
27, 2017, surveillance that I have conducted at his residence,
his California drivers license photo, and images of him in
social media posts.

16.  I have reviewed records received from JPMorgan Chase
Bank for account number ending in X9718 ("Account 4"), and
spoken to SA Stachnik about these records.  These records show
the following:

     a.  Account 4 was held in the name of CC-1.

     b.  CC-1 was the only signor on Account 4.

     c.  Between September and November 2016, $75,000 was
wired from Account 3 to Account 4, in five separate wires, and
$12,000 was deposited into Account 4 on December 2, 2016 from
"Aloha HR."  Prior to these transfers, the account had a near-
zero balance.

     d.  Between September 15, 2016, and December 31, 2016
(the time period for which I reviewed records): (i) more than
$24,000 was transferred from Account 4 to another JPMorgan Chase
Bank account maintained in CC-1's name ("Account 5"), which is
discussed in the next paragraph; (ii) more than $19,000 of cash
was withdrawn at locations in Utah (where one of NEWLING's
children was attending college), in Manhattan Beach (a
neighboring city to Hermosa Beach where NEWLING and CC-1 lived),

and around Las Vegas; (iii) $11,000 was transferred to one of NEWLING's children; (iv) more than $8,000 was paid to Cars Muffler & Automotive, the same auto store discussed in the previous paragraph; (v) more than $6,000 was spent at gun retailers, including money paid to a specialty AR-15 rifle manufacturer; (vi) $1,570 was paid to Aloha Board Shop (a surf & skate retailer in Honolulu); (vii) $1,200 was paid to Maui Sporting Goods (a fishing supplies shop in Honolulu specializing in spearfishing gear); (viii) $460 paid to Trilogy Spa (a Manhattan Beach spa); and (ix) $386 paid to The Guitar Center, the same music instrument store discussed in paragraph 13.f above.

17.   I have reviewed records received from JPMorgan Chase Bank for account number ending in X2792 ("Account 5"), and spoken to SA Stachnik about these records.  These records show the following:

        a.    Account 5 was held in the name of CC-1.

        b.    CC-1 and S.B. were the signors on Account 5.

        c.    Between September 15, 2016 and December 31, 2016 (the time period for which I reviewed records), more than $24,000 was transferred from Account 4 to Account 5.  Prior to these transfers, the account had a near-zero balance, and transfers from Account 4 were the only deposits made into Account 5 in the relevant time period.

        d.    On September 24, 2016, $3,948.95 was spent at "Get Some" Guns & Ammo (a gun shop in Murray, Utah, a suburb of Salt Lake City, where one of NEWLING's children was in college),

which was the same day that more than $10,000 was moved out of
Account 4, including $8,000 moved from Account 4 to Account 5,
$1,800 paid to Gallenson's Guns and Ammo (a gun shop in Salt
Lake City), and $457 paid to Armory shooting range (a gun store
and shooting range in Sandy, Utah, which is approximately
fifteen miles south of Salt Lake City).

   **D.    Interviews of S.H. and P.V.**

   18.   On April 25, 2017, I interviewed P.V.  Also in
attendance was FBI SA Tyler Stevens and P.V.'s attorney Erik
Fitting.  P.V. reported the following:

       a.    P.V. had worked for NEWLING at Aloha from 2014 to
2016.

       b.    P.V. had previously worked in the payroll
business for approximately eighteen years.

       c.    P.V. was responsible for, among other things,
paying payroll for ALOHA's clients (that is, paying employees'
wages).  She was not initially responsible for paying clients'
taxes.

       d.    P.V. received complaints from clients throughout
her time at ALOHA that their taxes were not getting paid.

       e.    P.V. reported these complaints to NEWLING, and
NEWLING told her that he was having an accountant take care of
it.  P.V. asked at one point who the accountant was, but P.V.
never received an answer.

       f.    In the middle of 2016, S.H. told P.V. that S.H.
was relaying a message from NEWLING that P.V. was going to take
on the responsibility of paying client taxes.

g.   P.V. did not want to take on this responsibility, and said that she did not have the right background or training for it and that they should hire an accountant to deal with tax issues.

h.   NEWLING (through S.H.) insisted that P.V. take over payment of client taxes, and P.V. prepared taxes for at least one client.

i.   P.V. was fired soon after, and asked to sign a statement that she had failed to pay client taxes.  She refused, feeling like NEWLING was trying to blame her for something she did not do.  She did not have access to ALOHA's bank accounts, and did not know if client taxes had been paid, but suspected they had not.

j.   After P.V. was fired, she started a competing payroll company and tried to take clients with her.

k.   P.V. believed that NEWLING had told at least one of ALOHA's clients that she stole their money, something that she vehemently denied doing.

19.   On June 1, 2017, I interviewed S.H.  Also present for the interview was SA Stevens.  I again interviewed S.H. by phone on June 5, 2017.  SA Stevens was physically present for this interview, which was conducted at S.H.'s attorney office in Las Vegas.  Also present for the interview was S.H.'s attorney Josh Tomshek, with AUSA Quinn joining by phone.  On June 22, 2017, SA Stachnik conducted a phone interview of S.H. with his attorney on the call.  In these interviews, S.H. reported the following:

a.   S.H. worked with NEWLING at ALOHA.

     b.    S.H. managed the Las Vegas office, and was involved in processing payroll (not taxes) for ALOHA's clients.

     c.    S.H. was aware that clients had been complaining that their taxes were not getting paid, but he understood NEWLING was taking care of it.  He received some of the complaints himself, and relayed those complaints to NEWLING, who assured him that everything was fine.

     d.    In mid 2016, NEWLING told S.H. to have P.V. take over payment of the taxes, which instruction S.H. relayed to P.V.  P.V. resisted at first, saying she did not want to take on this responsibility, but she eventually agreed.

     e.    P.V. did not make tax payment for clients as she was supposed to do, and she was fired, at NEWLING's direction. She was asked to sign a statement when she left regarding her failure to pay client taxes, but she refused.

     f.    NEWLING told S.H. that CC-1 would take over the responsibility of paying client taxes.

     g.    In approximately September 2016, NEWLING had S.H. open a Wells Fargo bank account in S.H.'s name.  This was around the time that a client had obtained a civil judgment against ALOHA and frozen assets in the Chase account that they had been using.  Prior to this time, S.H. did not have access to ALOHA's bank accounts.

     h.    Even after a bank account was opened in S.H.'s name, NEWLING continued to control the account, and had a bank card linked to the account.  To the extent S.H. also used the

bank card linked to the account, he used it for legitimate
business purposes only.

        i.   S.H. had only recently obtained access to the
Wells Fargo account (referred to above as Account 3), and he had
noticed large payments made out of this account for non-business
purposes, including one payment that he remembered to a pet
supply company.

        j.   S.H. had not confronted NEWLING about the
questionable payments, but knew that they did not have enough
money to make all of the payments that they needed to make for
clients at the end of the second quarter of 2017.

        k.   S.H. agreed to wear a wire following the second
meeting with the government, agreeing that he would try to
record meetings and conversations with NEWLING, and as discussed
below, he was able to record one such conversation, where S.H.
questioned NEWLING about payments being made from the Wells
Fargo account (i.e., Account 3).

        l.   NEWLING fired S.H. on June 22, 2017, a few days
after the recorded conversation about the questionable payments.
NEWLING claimed it was due to poor job performance.

     20.  I have listened to a recording that S.H. made of a
call with NEWLING on June 20, 2017.  The recording shows:

        a.   NEWLING admitted that CC-1 was handling the
payment of client taxes, and that they were trying to catch up
on delinquent taxes.

        b.   NEWLING admitted he wanted all of the accounting
to be done out of a single account so that it would be easier

for one person to monitor everything, and that the one person would be CC-1. NEWLING said that CC-1 would be paying all the bills.

c.   NEWLING told S.H. that he could take S.H.'s name off of the Well Fargo account if he had a problem with anything, saying this in response to S.H. telling NEWLING that he was physically sick over the thought of how there was not enough money in the bank account to pay the clients' bills.

d.   S.H. mentioned to NEWLING that he had been served with another lawsuit, and NEWLING responded: "It's the same [expletive] that we've all known about. We knew we'd get sued . . . These are all things we know about. . . . It's all going to be absorbed into the BK."

e.   As previously mentioned, on June 22, 2017, days after this telephone conversation, NEWLING fired S.H.

**E.   NEWLING'S AND CC-1'S RECORDED STATEMENTS**

21.   On July 27, 2017, I interviewed NEWLING and CC-1 at their home in Rancho Palos Verdes, California. (NEWLING and CC-1 had recently moved from Hermosa Beach, according to surveillance and information obtained from public records.) Also present for the interview was SA Stachnik. I recorded the interview, during which NEWLING and CC-1 stated the following, among other things:

a.   NEWLING owned a payroll business called ALOHA, which he had been operating in California and Nevada for two to three years.

b.   NEWLING had been in the payroll business for approximately eighteen years.

c.   NEWLING had just discovered that two employees, S.H. and P.V. (whom he referenced by their first names), had embezzled what he believed to be a few hundred thousand dollars each.

d.   NEWLING fired S.H. about a month prior to the interview.  Prior to S.H.'s termination, NEWLING had confronted S.H. regarding the embezzlement, and S.H. did not have an adequate explanation for where the money went.

e.   NEWLING claimed that he had only recently learned about the embezzlement (even though he also blamed P.V., and admitted that P.V.'s employment had been terminated in 2016). He stated that he had not yet reported the theft to authorities because he and CC-1 were still gathering evidence necessary to file a police report.  He also stated they would need to file for bankruptcy because of the embezzlement.

f.   NEWLING had not yet told any of the clients about the embezzlement.

g.   CC-1 admitted that she was in charge of payroll processing for ALOHA, and was working to determine to what extent clients' money had not been paid.

h.   NEWLING claimed that ALOHA's bank account had been in S.H.'s name, and S.H. was the only one with a debit card for the account.

F.   INTERSTATE WIRE

22.  From information in bank records, I know that, on or about February 3, 2016, a wire transfer in the approximate amount of $127,785 was made from Company 1's account at Bank of

25

America, N.A. in Nevada to Account 1 at JPMorgan Chase Bank, N.A. in Nevada through the interstate Fedwire system. From witness testimony and information in bank records, I believe that this wire transfer is a payment that Company 1 made to ALOHA for payroll and taxes.

23. I know from my training and experience, and discussions with other law enforcement officials, that all fund transfers processed through the FedWire system will travel interstate, at least as of November 2014, insofar as the transfer request will first be received and processed at Fedwire's primary processing site, which from November 2014 until late August 2016 was in Texas, and it will then be routed through a secondary processing site, which was in New Jersey during the same time period.

## IV. CONCLUSION

39. Based upon the foregoing, I submit that there is probable cause to believe that NEWLING violated Title 18, United States Code, Section 1343 (Wire Fraud).

Daniel R. Latham
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 31st day of July, 2017

HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE